# EXHIBIT 1

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

CASE NO.: **1:06-cv-286-JD**

| | |
|---|---|
| JAMES SCOTT; SUE SCOTT; STEPHEN ST. LOUIS; and ELLEN ST. LOUIS; for themselves and all others similarly situated;<br><br>Plaintiffs;<br><br>v.<br><br>FIRST AMERICAN TITLE INSURANCE COMPANY;<br><br>Defendant. | **PLAINTIFFS' MEMORANDUM IN SUPPORT OF UPDATED AND CLARIFIED JOINT MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT AGREEMENT AND STIPULATION** |

Plaintiffs, James and Sue Scott and Stephen and Ellen St. Louis submit this updated

and clarified memorandum in support of the parties' *Updated and Clarified Joint Motion*

*for Preliminary Approval of the Class Action Settlement Agreement and Stipulation.*[1]

## INTRODUCTION

The parties have filed with the Court a proposed settlement of this class action, which

provides for a minimum of over one hundred sixty-six thousand dollars in relief to class

members as well as significant benefits to New Hampshire homeowners in the form of a

revised rate filing that provides that Defendant "shall" (it used to say "may") give its

reissue rate discount to all homeowners who appear to qualify for it without the necessity

---

[1] The "*Updated Joint Motion*." Capitalized terms have the meaning attributed to them in the Stipulation, a copy of which was filed with the Court as Exhibit 7 to the parties' *Updated Joint Motion*. This memorandum consolidates all of the plaintiffs' briefing in support of all three prior motions for preliminary approval of the settlement and appointment of class counsel. Specifically, it consolidates memoranda filed September 7, 2007 as PACER Doc. No. 51-10, October 17, 2007 as PACER Doc. No. 58, and January 14, 2008 as PACER Doc. No. 62-2. Further, this memorandum specifically addresses the Fed. R. Civ. P. 23(g) factors for consideration in the appointment of class counsel.

of any additional evidence (it used to require a copy of the prior policy), and to give it on the entire new mortgage amount (it used to only give it up to the prior mortgage amount). *Exhibit A* is a copy of the new rate filing.

On September 7, 2007, the parties filed their initial *Joint Motion for Preliminary Approval of the Class Action Settlement Agreement and Stipulation*. The Court has denied the Parties' joint motion for approval of the Stipulation of Settlement three times, without prejudice. The parties have now filed simultaneous herewith their *Updated Joint Motion*, to which is attached their Conformed Stipulation of Settlement, which incorporates the three amendments made to the initial stipulation. See, Exhibit 7 to the *Updated Joint Motion*.

Entry of the proposed Preliminary Approval Order will allow the parties to give notice of the settlement to class members and to respond to properly filed objections, if any, and then to proceed to a hearing on final approval. As set forth more fully below, the proposed Settlement Agreement, as amended and conformed, is fair, reasonable and adequate, and worthy of preliminary approval.

## BACKGROUND

Plaintiffs commenced this putative class action lawsuit against First American in State court on July 1, 2006. On August 1, First American removed the case to this Court. After removal, Plaintiffs filed two amended complaints which added Stephen and Ellen St. Louis as named plaintiffs, and asserted three causes of action against First American: breach of contract, breach of the implied duty of good faith and fair dealing and unjust

enrichment. First American moved to dismiss Plaintiffs' second amended complaint and this court granted, in part, that motion and gave Plaintiffs leave to file a third amended complaint. Plaintiffs filed a third amended complaint asserting claims for unjust enrichment and breach of the implied covenant of good faith and fair dealing. The Court denied First American's motion to dismiss the third amended complaint for failure to join necessary parties, thus the third amended complaint remains pending before this Court.

## CLAIMS AND DEFENSES

In New Hampshire, the rates that may be charged by an underwriter for title insurance must be publicly filed and are subject to approval by the New Hampshire Insurance Department. Section 7 of First American's rate manual provides for the availability of a reduced, "reissue" loan rate, if a borrower who is refinancing a mortgage satisfies several very specific requirements. Section 7 provides:

> 7. Premiums for Reissue of First American Policies: First American grants reissue loan and reissue owner's rates if certain conditions exist as shown below.
>
> . . . .
>
> *Standard Loan Policy Reissues:*
>
> If the borrower refinances within TEN years of the first mortgage, the original loan is discharged, and a new mortgage placed on record, the loan reissue rate may be used to the extent of the amount of the first mortgage policy. Original or First Mortgage rates must be used on amounts in excess of the first policy. If the prior policy was not a First American policy, you must obtain a copy of the prior policy to qualify for the reissue rate.

The Plaintiffs allege their transactions were eligible for this discount but that they were charged the full rate for the coverage instead. They contend First American thereby breached the implied covenant of good faith and fair dealing in its contracts with them and the Class Members and that, alternatively, First American is unjustly enriched in the

3

amounts of the excess premium charges.  Plaintiffs seek actual damages, measured as the
difference between the premium they were charged and the reissue rate discount, as well
as statutory interest.  Plaintiffs have not sought attorneys' fees and costs nor punitive
damages.

First American denies all wrong doing and liability alleged in the action and states
that its practices are compliant with New Hampshire Law.  First American further
contends that Plaintiffs do not have any valid legal claims because, among other reasons,
no prior policy was produced in either of the Plaintiffs' transactions.  Moreover, First
American contends that, in any event, the reissue rate discount contained in its rate
manual does not *require* First American's agents to provide the reissue rate but rather
offers them the *option* of using the reissue rate if they choose to do so.  This central legal
defense was broached in connection with First American's motion to dismiss, and
although the Court denied the motion as to two of the three claims, it did appear to agree
with First American, at least preliminarily, as to this crucial defense.  See, *ORDER
granting and denying in part Motion to Dismiss; denying Motion to Remand to State
Court; granting Motion for Leave to File Reissue Affidavit; granting Motion for Leave to
File Surreply* (PACER Doc. 37), at pps. 10-11 (". . . the rate manual does not appear to
require First American to provide the reissue rate but rather offers the option of the
reissue rate, perhaps as a marketing tool for agents of First American policies").

Finally, although Plaintiffs believe that this action may properly be maintained as a
class action, First American has indicated that it will strenuously maintain that even if the

reissue rate discount was mandated in some of the subject refinance transactions (an assumption which it denies), identifying any such transactions would necessitate individual investigations of each of tens of thousands of closing files in the possession of hundreds of its individual agents, and that the necessity for these individualized determinations would render even a statewide class unmanageable.

Plaintiffs believe the proposed settlement offers significant relief, in that it provides that all class members who file timely and valid claim forms will receive a cash payment of at least 50%, and perhaps as much as 100%, of the difference between the premium they paid and the premium they would have paid had they received the reissue discount; and because it requires First American to file a new reissue rate provision that *requires* it to use the reissue rate in all refinances that occur within five years of the prior mortgage, without any requirement that a prior policy be submitted in order to qualify for this discount.

As to the monetary relief provided by the Settlement, the claims will be paid initially out of the $166,666 fund that First American has agreed to provide for this purpose, and it is possible that all claimants will receive 100% of the contested amount out of this $166,666 fund. However, if the filed claims exhaust this fund, then First American is *required* to make an additional contribution sufficient to ensure that all claimants receive *at least 50% of the contested amount*. See, *Stipulation*, Sec. V(E)(4)(c). As this Court has previously noted (Doc. 70 at 2), the settlement stipulation contains a paragraph that, for certain purposes, caps First American's maximum settlement liability at $330,200. *See*

Paragraph (V)(B)(2).  However, as this Court quoted in an earlier order (Doc. 67 at 7n.1),

the precise language of the § (V)(B)(2) limitation is as follows:  "First American's total

maximum settlement liability will not exceed $330,200 inclusive of the settlement fund,

administrative expenses, class representative fees, costs, expenses, attorneys' fees, and

any other charge, as outlined below, **except as provided in Section (V)(E)(4)(c) below**."

Thus, the § (V)(E)(4)(c) exception is critical to understanding the circumstances in which

First American's total liability is limited to $330,200 and the circumstances in which it is

not so limited.  Section (V)(E)(4) of the Settlement Stipulation, in context, provides as

follows:

> "**Awards For Qualified Claims.**  Upon expiration of the
> claims submission period each Class Member who submitted
> a Qualified Claim and who otherwise satisfies the
> requirements of this Stipulation is eligible to receive an
> Award after the Effective Date computed as follows:
>
> a.    If the aggregate amount of all Claimant Shares is
>       $166,666 or less, each Class Member shall receive an
>       Award equal to 100% of the Class Member's Claimant
>       Share.
>
> b.    If the aggregate amount of all Claimant Shares is more
>       than $166,666 but less than $333,333, each Claimant
>       Share shall be adjusted pro rata such that the adjusted
>       aggregate amount of all Claimant Shares equals
>       $166,666.
>
> c.    If the aggregate amount of all Claimant Shares is more
>       than $333,333, each Claimant Share shall be reduced
>       by 50% and OLF **shall notify First American of the
>       additional amount necessary to supplement the
>       Settlement Fund such that each Class Member who
>       submits a Qualified Claim shall receive an Award
>       equal to 50% of its Claimant Share and First
>       American shall pay that amount to OLF within 30**

6

**days after receiving such notification."**

Thus, the Settlement Stipulation has from the beginning included an "escape clause" from the cap on liability such that, if the aggregate claims submitted by Class Members exceed $333,333 (twice the $166,666 initially contributed by First American), then no Class Member's claim is reduced below fifty cents on the dollar, and First American is required to put more money into the Settlement Fund, notwithstanding the nominal cap of $330,200 on First American's maximum settlement liability. For example, if the aggregate amount of valid claims submitted by Class Members is $500,000, then First American would have to contribute $250,000 to the Settlement Fund instead of just $166,666. Similarly, if the aggregate valid claims submitted by Class Members amount to $600,000, then First American would have to contribute $300,000 to the Settlement Fund, so that no individual Class Member's claim would be reduced below fifty cents on the dollar, which is a substantial settlement payment in a case in which neither liability nor the certifiability of the class was conceded prior to the settlement.

## CLASS CERTIFICATION

Plaintiffs were in the midst of preparing their motion for class certification when this case was settled. In order to effect the settlement, the parties have agreed to a conditional Class (the "Class"). As set forth in Section (V)(B)(8) the Stipulation, the Class comprises:

> All "Class" or "Class Members" means all owners of New Hampshire property who, during the Class Period, refinanced mortgages on such property within ten years after the date of the issuance of a prior lenders policy of title insurance insuring a mortgage covering the same property, where there was no

change in ownership, and who paid a premium for a lenders policy of title insurance issued by First American in an amount in excess of the Reissue Rate. "Class Period" means the period of time from June 30, 2003 through December 31, 2007.

The designation of the Class is expressly made solely for the purposes of implementing the proposed settlement and the parties have specifically reserved their rights, should this proposed settlement not be fully implemented for any reason, to raise and litigate any and all issues as to whether this case can properly be maintained as a class action.

In preliminarily approving a proposed settlement, this Court should first consider whether to conditionally certify a settlement class. *See Amchem Products, Inc., v. Windsor*, 521 U.S. 591, 4 620 (1977) (trial court may disregard management issues in certifying a settlement class, but the proposed class must still satisfy the other requirements of Rule 23). Rule 23 of the Federal Rules of Civil Procedure governs the certification of class actions. One or more members of a class may sue as representative parties on behalf of a class if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims of defenses of the class; and (4) the representative parties will fairly and adequately protect the interest of the class. *See* Fed. R. Civ. P. 23 (a). In addition, an action may be maintained as a class action if the "court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the

8

controversy." Fed. R. Civ. P. 23(b)(3).

Many courts interpret Fed. R. Civ. P. Rule 23 to favor the maintenance of class actions. See *e.g.*, *In re Amerifirst Sec. Litig.*, 139 F.R.D. 423, 427 (S.D. Fla. 1991) ("the interests of justice require that in a doubtful case . . . any error, if there is to be one, should be committed in favor of allowing a class action"). The reason to favor class certification is that class action lawsuits are essential, and often the only practical way, to enforce consumer protection laws:

> In a large and impersonal society, class actions are often the last barricade of consumer protection . . . . To consumerists, the consumer class action is an inviting procedural device to cope with frauds causing small damages to large groups. The slight loss to the individual, when aggregated in the coffers of the wrongdoer, results in gains which are both handsome and tempting. The alternatives to the class action -- private suits or governmental actions – have been so often found wanting in controlling consumer frauds that not even the ardent critics of class actions seriously contend that they are not truly effective. The consumer class action, when brought by those who have no other avenue of legal redress, provides restitution to the injured, and deterrence of the wrongdoer.

*Eshaghi v. Hanley Dawson Cadillac Co.*, 574 N.E. 2d 760, 764, 214 Ill. App. 3d 995 (Ill. 1991).

In *Mitchell-Tracey v. United General Title Insurance Co.*, 237 F.R.D. 551 (D. Md. 2006), a federal district court took this approach in a reissue rate class action with facts virtually identical to those alleged in this case:

> Class certification is a useful tool which can economize and focus judicial resources by allowing the court to consolidate similar claims and provide consistent and conclusive final judgments. Class certification also allows claims that may not otherwise be brought, because bringing individual claims can be cost prohibitive when the remedy is either injunctive relief or small monetary damages.

*Id.*, at 555. Simple consumer cases such as this one are routinely certified as class

actions by state and federal courts in New Hampshire and elsewhere. The United

States Supreme Court recently noted that cases involving consumer or securities

fraud or violations of anti-trust laws are especially appropriate for class action

treatment. *Amchem,* at 625. See also *Mulligan v. Choice Mtg. Corp. USA*, 1998

U.S. Dist. LEXIS 13248, *9, 1998 WL 544431, *3 (D.N.H. 1998) (certifying class

of New Hampshire consumers in case against their mortgage broker).

Indeed, the New Hampshire Superior Court has just granted preliminary approval to

a substantially identical classwide settlement in a substantially identical reissue rate case

against Chicago Title Insurance Company (First American's largest competitor). See,

*Terry v. Chicago Title Ins. Co.*, Hillsborough Cty North District, CA No. 06-464.

Naturally, as part of the preliminary approval of that classwide settlement, the *Terry* court

granted conditional approval of the settlement class. In that settlement, notice has gone

out and more than a thousand valid claims have already been mailed in.

As the *Terry* court did, this Court should likewise find that the allegations against the

title insurer defendant—involving uniform overcharges in connection with the issuance

of title insurance—raise questions that can be resolved, once and for all, in a class action,

thereby rendering this settlement class viable under the *Amchem* standard. The legal and

factual issues which control resolution of this case for the named Plaintiffs and for all

Class members are relatively simple and straightforward. Indeed, this case does not

present the complexity of other types of cases which are commonly certified as class

actions either over objection or through settlement. See, *e.g.*, *In re New Motor Veh. Canadian Exp. Antitrust Litig.*, 2007 U.S. Dist. LEXIS 20563 (D. Me. 2007) (antitrust); *In Re A. H. Robbins Co., Inc.*, 880 F. 2d 709 (4th Cir.), *cert.* denied, 493 U.S. 959 (1989) (mass tort); *Phillips Petroleum Company v. Shutts*, 472 U.S. 797 (1985) (securities fraud).

In further support of their contention that proper and sufficient grounds for class certification exist under Rule 23(a) and 23(b(3), Plaintiffs would show the following:

**A. Numerosity.** Rule 23(a)(1) requires a class be so large that joinder of all members is "impracticable." Fed. R. Civ. P. 23(a)(1); *In re Tyco Intern., Ltd.*, 2006 WL 2349338 * 1 (D.N.H. Aug. 15, 2006) (Barbadoro, J). In this case, although the exact size of the Class is not yet known, the Complaint alleges that within the class period, First American failed to give the reissue rate discount to *thousands* of class members, while charging more than $50 million in total title insurance premiums in New Hampshire. Third Amended Complaint, ¶30(a) ("TAC" below). Indeed, given the frenetic activity in the mortgage industry between 2003 and 2006, one would expect, based on general knowledge and common sense that the number of consumers entitled to the reissue rate discount would be quite high, and certainly more than the handful discovered to date. *Mitchell-Tracey*, 237 F.R.D. at 556-57.

Where, as here, "the number of potential class members and their geographic distribution are sufficiently great", it can be strongly inferred that the size of the Class is sufficiently numerous that it would be impractical to join all of the claims of the Class

members in one lawsuit. *See In re Tyco Intern., Ltd.*, 236 F.R.D. 62, 68 n. 2 (D.N.H. 2006).[2]

In this case, the evidence proves that the number of potential class members exceeds the minimum threshold to establish numerosity.[3]  Based on the information maintained in First American's computer systems, mailed notice will be directed to over 50,000 persons (Diamond Dec. ¶ 10).  Although there is no way to definitively establish the number of mail notice recipients who are class members prior to reviewing the claims during the claims administration process, the evidence shows that First American and its independent agents rarely offered the reissue rate discount during the class period, even though a substantial proportion of the nearly 58,000 transactions during the class period were refinances of mortgages that were less than ten years old.

More specifically, data extrapolated from First American's computer systems indicates that during the class period, First American issued nearly 58,000 lenders

---

[2] Other factors, such as the geographic diversity of the class members, the economic resources of the class members, and the likelihood that many of them will file their own individual actions, also point to a finding of numerosity in this case.  However, most authorities conclude consideration of these extrinsic factors is unnecessary where there are more than 40—let alone, as here, hundreds of—individuals within the proposed class. See, *e.g.*, *Cox v. American Cast Iron Pipe Co.*, 784 F.2d 1546 (11th Cir. 1986), cert. *denied* 479 U.S. 883 (1986) ("while there is no fixed numerosity rule, 'generally less than twenty-one is inadequate, more than forty adequate, with numbers between varying according to other factors'"), citing 3B Moore's *Federal Practice* ¶23.05[1] at n.7 (1978); *Ladegaard v. Hard Rock Concrete Cutters, Inc.*, 2000 U.S. Dist. LEXIS 17832 (N.D. Ill. 2000) ("The consideration of other factors is usually necessary only where the proposed class size is smaller than 40") (citing 7A Wright, Miller & Kane, Federal *Practice & Procedure* §1761 (1986)).

[3] Since the Court initially requested additional briefing on the Rule 23 requirements, the parties engaged in additional informal discovery that provides factual support to prove that numerosity, predominance and superiority are satisfied in this proposed settlement class. See the declarations of Carol Willoughby, Peter Caruso, and Richard A. Diamond (Exhibits 14, 15, and 16, respectively, to the Updated Joint Motion).

policies (without issuing a simultaneous owners policy).  *Id.*, ¶¶14-15.  Of this pool of

nearly 58,000 potential class members, over 56,000 of them were charged the full rate

and less than 2,000 were charged the reissue rate.  *Id.*, ¶¶14-15.  Yet, of these 56,000

consumers, a "substantial proportion" were refinancing their existing mortgages.

Willoughby Dec., ¶11.  And industry standards establish that most of these transactions

will be refinances of mortgages that were less than ten years old.  Joint Center for

Housing Studies of Harvard University, *The State of the Nation's Housing 2005*, p. 6,

*available at* www.jchs.harvard.edu/publications/markets/son2005/index.html, *visited*

January 14, 2008 (finding that homeowners hold their mortgage loans, on average, for

only two years before refinancing).[4]

    Finally, although a handful of the thousands of otherwise-qualified transactions

might be disqualified due to nominal ownership changes (such as one spouse deeding to

both spouses, or *vice versa*) or property line adjustments, nonetheless the vast majority of

these refinance transactions that involved prior mortgage less than ten years old qualified

for the reissue rate.   But again, out of all of these transactions, just 1,507 got the reissue

rate.  Diamond Dec. ¶ 15.  Indeed, the agent that issued the St. Louises' policy, Caruso &

Caruso, LLP, issued 155 policies at the standard rate, but it did not issue one single

---

[4] Several federal courts have validated the use of industry standards to establish the numerosity requirement in similar refinance class actions. *E.g.*, *Cohen v. Chi. Title Ins. Co.*, 242 F.R.D. 295, 299 (D. Pa. 2007)(finding numerosity satisfied where statistics regarding mortgage refinancing for the period suggested that as many as 90 percent of the insureds at the basic rate should have received the reissue or the refinance rate); *Mitchell-Tracey v. United Gen. Title Ins. Co.*, 237 F.R.D. 551, 556 (D. Md. 2006)(finding numerosity satisfied based solely on level of mortgage activity during class period); *see also Woods v. Stewart Title Guar. Co.*, 2007 U.S. Dist. LEXIS 71646, at *4 (D. Md. 2007)(same).

policy at the discounted reissue rate. *Id.*, ¶¶16-18.

Ms. Willoughby's declaration establishes that a substantial proportion of the 58,000 transactions were refinances, and the housing report establishes that the average refinance occurs when a mortgage is just two years old. Yet, First American's data indicates that very few applicants received the reissue discount (just 1,507 of them out of nearly 58,000 applicants). Based on these statistics, it is likely that thousands of the mail notice recipients were entitled to, but did not, receive the reissue rate. The evidence proves that the proposed settlement class membership is so large that joinder is impracticable, as even the most conservative estimate of this number is in the thousands. This satisfies the numerosity requirement.

**B. Commonality** The commonality requirement of Rule 23(a)(2) "is not a high bar." *Tyco*, 236 F.R.D. at 68, n. 2 (*citing In re Chiang*, 385 F.3d 256, 265 (3d Cir. 2004)). "Because the class need share only a single legal or factual issue at this stage of the analysis, the commonality requirement ordinarily is easily satisfied." *Mulligan, supra.* Where the case arises out of "standardized conduct of the defendant towards members of the proposed class, commonality is usually met." *Id.*, citing *Curtis v. Commissioner, Maine Dep't of Human Servs.*, 159 F.R.D. 339, 341 (D. Me. 1994).

The pertinent factual and legal issues in this case clearly are common to the class. Here, the scope of the central question pertinent to the class members—whether the class members were entitled to the reissue rate discount by the Defendant—is identical in all material respects. The inquiry in this case would focus on standardized forms that are not

14

only uniform in respect to the Defendant's operations, but are consistent throughout the title insurance industry. Finally, Plaintiffs note that the assessment of damages in this case would present a straightforward mathematical calculation. See generally *Mitchell-Tracey*, 237 F.R.D. at 557.

Legal and factual questions will be viewed as commonly shared so long as "their resolution does not depend on the facts of any class member's particular claims, but depends rather on the evidence presented taken as a whole." *Chapelle v. E.I. DuPont DeNemours & Co.*, 75 F.R.D. 74, 77 (E.D. Va. 1977). The practices alleged in this case were uniformly applied through form-driven title closing procedures. Plaintiffs would show the forms were supplied by First American to its appointed agents, and did not vary from one borrower to another. Thus, in regard to the class claims, no extraordinary facts exist in the individual Plaintiffs' experience.

Commonality in this case is easily established as the plaintiffs' and the class members' claims arise from First American's routinized procedures and practices of failing to provide the reissue rate discount in connection with transactions that qualify for it. See *Lessard v. Metropolitan Life Ins. Co.*, 103 F.R.D. 608, 610 (D. Me. 1984) ("common questions of law concerning defendant's "standardized conduct with respect to the members of the proposed class" satisfy the commonality requirement); *Fabricant v. Sears Roebuck & Co.*, 202 F.R.D. 310, 2001 U.S. Dist. LEXIS 12888 (S.D. Fla. 2001) ("substantial common questions of law and fact with respect to (1) the standardized forms, procedures and disclosures made or required and (2) the legal effect of those

15

disclosures, satisfy commonality element").

**C. Typicality** Rule 23(a)(3) requires that the representative's claim be typical of

those of the members of the class. "The typicality requirement is not highly demanding"

because "the claims only need to share the same essential characteristics, and need not be

identical." 5 Moore's Federal Practice § 23.24[4]. In *In re Enterasys Networks, Inc. Sec.*

*Litig.*, 2002 U.S. Dist. LEXIS 15450, *6 (D.N.H. 2002), our federal district court

explained that the plaintiff makes her preliminary showing of typicality by simply

showing that her "claims arise from the same event or practice or course of conduct that

gives rise to the claims of the class members and the claims are based on the same legal

theory." Likewise, the *Mulligan* Court observed that:

> The question is simply whether a named plaintiff, in presenting his case, will
> necessarily present the claims of the absent plaintiffs. *Priest v. Zayre Corp.*,
> 118 F.R.D. 552, 555 (D. Mass. 1988) (citation omitted). . . . "When it is
> alleged that the same unlawful conduct was directed at or affected both the
> named plaintiffs and the class sought to be represented, the typicality
> requirement is usually met irrespective of varying fact patterns which underlie
> individual class members' transactions." 1 Newberg on Class Actions §3.13,
> p. 3-77.

*Id.*, at *9-10.

Here, Plaintiffs' claims are typical of the claims of the class members they seek to

represent. All such claims arise out of First American's common course of conduct in

unfairly discriminating against them by giving other applicants—but not them—the

favorable reissue rate even though all of their transactions fit this rate classification

according to First American's own filed and approved rates and classifications. Were

this case to proceed, Plaintiffs would look to show by title orders, title reports, and title

16

affidavits that in connection with both their own transactions, and the class members' transactions, sometimes First American's agents conducted mere "rundowns" rather than full title examinations in connection with their refinance transactions prior to issuing the coverage. This protocol clearly satisfies the typicality requirement.

**D. Adequacy** Rule 23(a)(4) requires that the representative parties fairly and adequately protect the interests of the class. In the First Circuit, this requirement has traditionally entailed a two-pronged inquiry: first "[t]he moving party must show that the interests of the representative part[ies] will not conflict with the interests of class members, and second, that counsel chosen by the representative party is qualified, experienced and able to vigorously conduct the proposed litigation." *Andrews v. Bechtel Power Corp.*, 780 F.2d 124, 130 (1st Cir. 1985). With the recent enactment of the new Federal Rule of Civil Procedure 23(g), evaluating the adequacy of class counsel is now considered separately from the determination of the adequacy of the class representatives. In any event, both prongs of the adequacy requirement are satisfied here.

(i) Adequacy of the Proposed Class Representatives. The proposed class representatives have no interests which are antagonistic to those of the members of the proposed class. As noted in the TAC, (¶30(d)), the proposed class representatives have no conflicts of interest and they are committed to the case and will fairly and adequately protect the interests of all class members in the prosecution of this action and in the administration of all matters relating to claims stated herein. They are similarly situated with, and have suffered similar injuries as, the members of the class they seek to

17

represent. They feel that they have been wronged and they wish to obtain redress of the wrong. The class representatives' desire for freedom from allegedly illegal consumer practices is common to that of all class members. They seek to demonstrate, *inter alia,* that First American's standardized conduct and routine procedures and practices of performing shortened title searches on the plaintiffs' and class members' transactions as if these transactions qualified for the reissue rate discount (which in fact they did qualify for), but then charging them premiums based on the full rate (as if a full title search had been done), caused them to suffer financial harm and that First American's conduct in doing so constituted breaches of the implied covenant of good faith and fair dealing, and resulted in its unjust enrichment. They seek to hold First American liable to them and the class members for their actual damages. There is no evidence that the claims of the proposed class representatives will conflict with the claims of the class members or that the class representatives have an interest which might cause them not to vigorously pursue this action. Nor is there any evidence that the class representatives are not committed to the action.

(ii) Rule 23(g) Adequacy of the Proposed Class Counsel. Rule 23(g) requires a court to assess the adequacy of proposed class counsel. To that end, the court must consider the following: (1) the work counsel has done in identifying or investigating potential claims in the action, (2) counsel's experience in handling class actions, other complex litigation, and claims of the type asserted in the action, (3) counsel's knowledge of the applicable law, and (4) the resources counsel will commit to representing the class.

*Fogarazzao v. Lehman Bros., Inc.*, 232 F.R.D. 176, 182 (S.D.N.Y. 2005).  The docket sheet in this case, together with the averments contained in counsel's *Declaration* (See, PACER Doc. No. 51-12, "*Declaration of Edward K. O'Brien*"), establish that counsel—who came into this case fully acquainted with mortgage lending practices including title insurance industry and mortgage refinance closing practices—spent considerable time investigating and testing potential claims, has extensive experience in consumer class actions, is knowledgeable in the applicable statutory and common law, and has and is prepared to continue to devote sufficient resources to representing the class.  See also, "*Rule 23(G)(1)(A) Factors*" section below.

The Court was initially concerned that the class representatives' fee award was structured in a way that might affect the adequacy of the class representatives.  It is indeed true that if the class representatives were being paid out of the settlement fund such that this might affect the amount the other class members were to receive, then this structure would create an inherent conflict of interest between the class representatives and the class they seek to represent, making them inadequate under Rule 23(a).  However, this is not the way the class representative fee is structured in this case.

Under the proposed updated Stipulation First American is obligated to pay the $6,000 class representatives' fees *in addition to, not out of*, the settlement fund that has been set aside for paying class members who file timely and valid claim forms.  Regardless of the ultimate number of claimants and regardless of the aggregate amount that First American must pay them, all claimants will receive at least 50% of the contested amount, and under

no circumstances will any claimant's share by reduced, by one cent, on account of attorneys fees, administrative costs, or the class representatives' fees, as these amounts are being paid in addition to, and not out of, the settlement fund. [5]

No conflicts exist as between the class representatives and the class members they seek to represent, and therefore the adequacy requirement is met.

**E. Common Questions Predominate and the Class is Superior to other Methods of Adjudication.** After meeting the threshold requirements of Rule 23(a), a plaintiff must establish that their proposed class meets the requirements of Rule 23(b)(3). To certify a class under Rule 23(b)(3), the Court must find that: the questions of law or fact common to the members of the class predominate over any question affecting only individual members, and that a class action is superior to other available methods of the fair and efficient adjudication of the controversy. Fed. R. Civ. P. 23(b)(3). Here, the Plaintiffs satisfy the predominance and superiority criteria of Rule 23(b)(3). It is well established that in determining whether common questions predominate, the Court's inquiry should be directed primarily toward the issue of liability. Indeed, "[w]here, as 10 here, common questions predominate regarding liability, then courts generally find the

---

[5] The total *minimum* consideration for the settlement is $330,200. Here is the breakdown: $166,666 settlement fund; $74,200 administration fund for costs of notice and claims processing; $83,333 attorneys' fees; $ 6,000 class representative fees. See, *Stip.*, Sec. V(B)(2, 3, 5- 6). The requirement that First American supplement the settlement fund to ensure that all claimants receive at least 50% of the contested amount is contained in *Stip.*, Sec. V(E)(4)(c). The stipulation does not provide for any adjustments to the administration fund, or to the attorneys fees or the class representative fees under any circumstances, and these fees are paid in addition to, and not out of, the settlement fund. See, *Stip.*, Sec. V(B)(2, 3, 5- 6). Therefore, no conflicts exist between class counsel or the class representatives, on the one hand, and the class members, on the other hand.

20

predominance requirement to be satisfied." *Smilow v. S.W. Bell Mobile Sys. Inc.*, 323 F.3d 32, 40 (1st Cir. 2003); *In re Relafen Antitrust Litig.*, 218 F.R.D. 337, 345 (D. Mass. 2003). When common questions represent a significant aspect of a case and they can be resolved in a single action, class action status is appropriate. *See* 7A Wright, Miller & Kane, *Federal Practice and Procedure: Civil 2d*, § 1788 at 528 (1986). "Rule 23(b)(3) requires merely that common issues predominate, not that all issues be common to the class." *Smilow*, 323 F.3d at 39. In the instant action, the existence of common questions and their predominance over individual issues are exemplified by the fact that, if every class member were to bring an individual action, each plaintiff would be required to demonstrate the same omissions or misrepresentations to prove liability. Thus, this case illustrates the principle that the predominance requirement is "readily met" in many consumer cases. *Amchem*, 421 U.S. at 625.

The most important issues in this case, both factually and legally, are predominantly common to the class. For individual borrowers who were denied the reissue rate discount—whose damages vary from a few dollars to several hundred dollars—there is little to gain by way of individual suits for damages, making class action adjudication the only practical way in which the consumers can obtain relief against First American. This case focuses on the Defendant's uniform and consistent practice of performing shortened title searches and relying upon the presumptive existence of prior title policies (as if the transactions qualified for the discounted reissue rate– which they did), but then collecting title insurance premiums from class members based on the inapplicable, full rate (as if it

had performed full title searches– which it did not), and it focuses on Defendant's equally uniform and consistent practice of thereby charging amounts that are not permitted under New Hampshire insurance law and regulations. The case also focuses on whether the Defendant's protocols, guidelines, and oversight of its agents, precluded the class from receiving the reissue rate discounts to which they were entitled. These practices give rise to common issues of law and fact which predominate over any possible individual issues in this case. In fact, the common questions of law and fact are virtually the only issues in this case.

Based upon this analysis, it is clear that certification of a settlement class is appropriate. First, it is unlikely that an individual plaintiff would have the resources to pursue a claim – especially since any individual claim is only a couple of hundred dollars, at most. As one court has noted:

> This is precisely the kind of case that class actions were designed for, with small or statutory damages brought by impecunious plaintiffs who allege similar mistreatment by a comparatively powerful defendant, one that, if the facts alleged were proved, otherwise might get away with piecemeal highway robbery by committing many small violations that were not worth the time and effort of individual plaintiffs to redress or were beyond their ability or resources to remedy.

*Jackson v. Check'N Go of Illinois, Inc.*, 193 F.R.D. 544, 547 (N.D. Ill. 2000).

Factors relevant to a finding of superiority include: (a) the interest of members of the class in individually controlling the prosecution of defense of separate actions; (b) the extent and nature of any litigation concerning the controversy already commenced by or against the members of the class; (c) the desirability or undesirability of concentrating the

litigation of the claims in the particular forum; and (d) the difficulties likely to be
encountered in the management of a class action. Fed. R. Civ. P. 23(b)(3).  Many, if not
most, of the Class members are individuals for which prosecution of a costly damages
action on their own behalf does not provide a realistic or efficient alternative.  The
District of New Hampshire is the most appropriate forum because the misconduct at issue
occurred and was focused here as this is where the transactions occurred.  Additionally,
as to Rule 23(b)(3)(D), Plaintiffs believe no difficulties will be encountered in the
management of this class action and Settlement.  In terms of fairness and efficiency, this
Court should balance the merits of certifying a class against the possible other methods of
adjudication. Absent a class action, this Court would be faced with the task of potentially
litigating numerous lawsuits: [T]he benefits to the large number of class members, many
of whose claims are so small that their size does not provide to impetus to bring
individual actions, clearly outweigh any problems which may arise in the management of
the class action. Economy will undoubtedly be achieved. Not only economy which will
benefit members of the class, but economy which will benefit the judicial system as well.
*Kirby v. Cullinet Software, Inc.*, 116 F.R.D. 303, 311 (D. Mass. 1987) (*quoting Bernson
v. Faneuil Hall*, 100 F.R.D. 468, 471 (D. Mass. 1984)); *see also Smilow*, 323 F.3d at 41
("The core purpose of Rule 23(b)(3) is to vindicate the claims of … groups of people
whose individual claims would be too small to warrant litigation").

    In their initial memorandum, Plaintiffs reasoned that the predominance requirement
was satisfied because First American's liability to each of the class members would

depend upon the same issue: whether the applicant was eligible for the reissue rate but was charged a higher premium for First American title insurance. They maintained that eligibility for the reissue rate could be determined based on objective criteria contained in the Defendant's files and records, and that although compilation of this evidence of eligibility might be time-consuming, they would be willing to do whatever work was required in this regard.

Although the Court agreed with Plaintiffs' predominance argument *so far as it went*, the Court concluded that Plaintiffs had failed to address the matter of whether the Defendant's protocols, guidelines, and oversight of its agents, precluded the class from receiving the reissue rate discounts to which they were entitled. The Court was concerned that while these unaddressed protocol, guidelines and oversight of its agents might raise common issues, they also might give rise to individual defenses.

To address the Court's concerns, the Plaintiffs obtained and the parties submitted the declarations of two of First American's managers familiar with relevant protocols, guidelines and agent oversight: Ms. Carol Willoughby, a First American Vice President who is State Counsel for its New Hampshire operations; and Mr. Richard Diamond, its IT Manager for the region encompassing New Hampshire. (Exhibits 14 and 16 to the *Updated Joint Motion*, respectively).

Mr. Diamond's declaration establishes that First American has uniform protocols and guidelines as to all of its New Hampshire agents, in the area of data collection and maintenance. All the agents submit transaction information in the same way. Diamond

24

Dec., ¶4. Its computer system records the same information for each transaction, and although the system records whether the Basic (full) or Reissue (discount) rate was given, *Id.*, ¶5, it does not record and it cannot determine whether any particular transaction in which the full rate was charged actually qualified for the discount rate. *Id.*, ¶14. Plaintiffs contend that First American's data collection, as described above, fails to ensure that applicants who qualify for the discount rate are reasonably likely to actually receive it, as the data collection system provides no opportunity for First American to exercise any oversight over any of its agents as to whether they are using the correct, applicable rate table in these transactions. Inasmuch as the agents have a strong incentive to charge a premium based on the higher rate (as they retain a large portion of the total premium as a commission), this utter lack of agent oversight raises important common legal and factual issues.

Indeed, this lack of oversight perhaps explains why one of their agents–Caruso & Caruso, LLP, which issued the St. Louis policy–was permitted to issue 155 lenders policies at the full rate, but *none* at the discount rate. Caruso & Caruso's standard practice and procedure for pricing its First American policies during much of the class period reflects a total lack of understanding of, or total disregard for, First American's obligations under New Hampshire law. The *Declaration of Peter Caruso II*, which comprises Exhibit 15 to the *Updated Joint Motion*, basically admits that this agent only offered the discount rate to applicants who showed up at the closing with a copy of the prior policy in their hands. Caruso Dec., ¶8. Since few consumers know of the discount

rate, let alone the purported need to bring in a copy of the prior policy in order to get it, it is hardly surprising that this First American agent did not give the discount rate to a single New Hampshire consumer, Diamond Dec., ¶18, and that it instead pocketed commissions based upon the full rate each and every time. One would think that with adequate agent oversight, First American would have caught this glaring deficiency in its agent's operating procedures.

Moreover, the Diamond Declaration makes it clear that First American lacked meaningful oversight pertaining to rate compliance as to not only this agent, but as to all of its New Hampshire agents: In ¶15, Mr. Diamond admits that First American agents only gave the reissue rate in 1,507 transactions, out of nearly 58,000 transactions in which just a lenders policy was issued. With adequate agent oversight, it is likely that thousands of its applicants would have received the discount.

Indeed, as to agent oversight on rate selection, First American has admitted no such agent oversight exists. Mr. Diamond has conceded that First American does not collect information from its agents sufficient to determine whether the right rate was given (Diamond Dec., ¶14). Moreover, Ms. Willoughby has conceded that when First American audits its agents it does *not* bother to check whether policies issued at the full rate actually qualified for the reissue rate. Willoughby Dec., ¶10. Instead, it simply presumes that the full rate was applicable to the transaction, and it merely checks the math to see whether the full rate was correctly computed and collected from the consumer. *Id.* Thus, defendant's "agent oversight"–or rather its lack of any agent

oversight–pose common issues and do not raise the possibility of individual defenses.

Likewise, defendant's "protocols and guidelines"–or rather its lack of any protocols and guidelines designed to ensure that qualified applicants get the reissue rate–pose common issues and do not raise the possibility of individual defenses.  First American failed to design and implement any protocols or guidelines whatsoever, to reasonably ensure that applicants who qualified for the reissue rate would actually get it.  Ms. Willoughby has admitted that neither its rate schedule, nor any of its protocol or guidelines issued before this case was filed, required its agents to notify or disclose to the consumer who was refinancing his or her home, that a rate discount was available, or that a copy of the prior policy might need to be obtained in order to get it.  Willoughby Dec., ¶¶5-9.  She concedes that "we rely on the agent to determine the appropriate rate to charge  . . . .", and that First American makes no effort to ascertain, either on an ongoing basis or during audits, whether its agents are charging the correct rate. *Id.*

The result of this total absence of protocols, guidelines and agent oversight, is that only a handful of consumers who qualified for the reissue rate–only those few who somehow found out about the discount and demanded that they get it–actually got it.  The rest of the applicants are the class members in this case.  This lack of protocols, guidelines and agent oversight as to rate calculations does not raise the possibility of individual defenses– instead it gives rise to predominating common issues best resolved on a classwide basis.

Finally, the Diamond Declaration shows that First American can generate a computer

list of potential class members, and as a result, any and all *actual* class members on that over-inclusive list can self-identify by sending in their claim form along with their HUD Settlement Statement. Although Plaintiffs maintain that they could have managed to collect all necessary proof had this case gone to trial, still if the Court did have any manageability concerns presumably they are greatly reduced by this evidence. In any event, it is well-settled class action law that the district court need not address manageability concerns in the context of a settlement class. *Amchem*, *supra*; *Waste Mgmt.*, *supra*.

As shown in the prior submissions and by this brief, common issues predominate over any individual issues in this case and a class action is the superior method of adjudication such that this case satisfies the requirements of Rule 23(b)(3).

Clearly, as set forth above, a class action is the superior method of adjudication and satisfied the requirements of Rule 23(b)(3). Solely for the purposes of settlement, defendants do not dispute that the Class should be certified in accordance with Rule 23(b)(3). As such, the Court should conditionally certify the Class for settlement purposes.

## RULE 23(G)(1)(A) FACTORS

Pursuant to Fed. R. Civ. P. 23(g)(1)(A)(i-iv)), the district court must consider the following factors in determining whether to appoint plaintiffs' counsel as class counsel: (i) Work done identifying potential claims; (ii) counsel's experience handling class actions (including those involving similar claims); (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel has and will commit to representing

the class. Plaintiffs submit that their counsel, Edward K. O'Brien, of O'Brien Law Firm, PC, is suitable for appointment as class counsel under these factors, as is shown below.

Counsel for the plaintiffs is very familiar with the mortgage industry and the role of title insurance within it. Mr. O'Brien focuses solely on the representation of consumers in individual and classwide challenges to unlawful and deceptive lending and business practices. Having formerly represented numerous banks and mortgage companies in state and federal regulatory compliance matters, and having served on the senior management team and board of directors of a financial services holding company (state-chartered bank, subprime mortgage company and leasing company), Mr. O'Brien brought significant knowledge and experience to his investigation of the potential claims the plaintiffs and class members could bring against this title insurer.

To begin with, Mr. O'Brien is well acquainted with, and keeps up with, numerous similar "reissue rate" cases pending in other states. See, *e.g.*, *Cohen v. Chicago Title Insurance Co.*, 2007 U.S. Dist. LEXIS 26137 (E.D. Pa., April 5, 2007); *Mitchell-Tracey v. United General Title Insurance Co.*, 237 F.R.D. 551 (D. Md. 2006) *Dubin v. Security Title Insurance Co.*, 832 N.E.2d 815, 162 Ohio App. 3d 97 (Ohio Ct. App. 2005); *In re Coordinated Title Insurance Cases*, 784 N.Y.S.2d 919, 2004 WL 690380 (N.Y. Sup. 2004); *Mitchell v. Chicago Title Insurance Co.*, 2003 WL 23786983 (Minn. Dist. Ct. Dec. 22, 2003); *Lentini v. Fidelity Natl Title Ins Co of New York*, U.S. District Court, District of Connecticut, No. 3:06-cv-00572-AWT; *Piazza v. First American Title Insurance Co.,* U.S. District Court, District of Connecticut, No. 3:06-cv-00765-AWT;

*Castro v. Old Republic Natl Title Ins Co.*, U.S. District Court, District of Connecticut,
No. 3:06-cv-00765-AWT. All of these cases arise out of the title insurer's alleged failure
to apply the discount rate on file with the state, to the class members' refinance
transactions. Most of the cases contain or contained claims for breach of express and
implied contracts, unjust enrichment, and money had and received. The title insurer
moved to dismiss some or all of the claims, and the court ruled on the law as to each such
claim. Plaintiffs' counsel kept abreast of these developments in the law, on a near daily
basis, through LEXIS and PACER, including careful review of all briefs submitted by the
parties. Likewise, counsel was attentive to the motions for class certification litigated in
these cases, as well as the settlements eventually achieved in many of them. Plaintiffs'
counsel also carefully examined New Hampshire's title insurance law (NH RSA 416-A),
and all relevant common law.

The essence of the case is explained thusly: Institutional mortgage lenders require
title insurance as a condition to making the loan, in order to assure the priority of their
lien position.[6] Thus, title insurance is an inevitable and unavoidable cost of any
residential refinancing transaction. Though New Hampshire homeowners cannot avoid
paying for the lenders policy of title insurance when they refinance their first mortgage
loans, it is not appropriate for First American to file its discounted reissue loan rate with

---

[6] One of First American's competitors has conceded that ("[l]enders in the United States
generally require title insurance as a condition to making a loan on real estate, including
securitized lending"). 2005 Form 10-K, *First American Information Services Corp.*, at p. 1
*available at* http://www.First American.com/docs/SISCO_10-K_2005.pdf (visited May 5, 2007).
This fact has not been seriously contested in any of these reissue rate cases.

the state and rely upon abbreviated title examinations consistent with transactions that qualify for its substitution loan rate, but then conceal the availability of the substitution loan rate and instead calculate its premium charges as if the much higher original rate applied. Yet this is precisely what First American has done in New Hampshire.

The title orders it received from the new lenders revealed that these were merely refinances of recent first mortgages given to institutional lenders, which universally require clean, standard form ALTA lenders policies. Accordingly, First American knew or should have known that these transactions qualified for its substitution loan rate, and First American necessarily relied upon the existence of an acceptable prior policy—and justifiably so—without bothering to obtain a copy of it, and it ordered shortened title examinations, called one- or two owner "rundowns." The problem is this: it then calculated the premiums based on its inapplicable standard full rate, rather than on the *applicable* filed rate– its substitution loan rate.[7]

Most New Hampshire homeowners know very little about title insurance. They are unaware that the industry—including First American—utilizes a two-tier premium pricing structure for the lenders policy required by institutional residential mortgage lenders. The higher, original rate is the maximum permissible premium the title insurance company may charge for the lenders policy when the home is being purchased and a *full* title examination is being conducted. The lower, reissue loan rate, is the maximum permissible premium the title insurance company may charge when the first

---

[7] State title insurance law requires First American to retain for 20 years evidence of all title examinations it has relied upon in issuing title insurance coverage. RSA 416A:6.

mortgage is being refinanced and a *shortened* title examination (called a "rundown") is being conducted.

The reissue loan rate is used in these simple refinances for at least two reasons. First, the title insurer is *not* ordering, or reviewing, the usual 35-50+ year title examination required under New Hampshire's title standards.[8] Instead, it is merely ordering a short, less-expensive one- or two owner "rundown," which may cover a time period of just a few years. It orders this "rundown" because it reasonably believes that the "back" title was already examined and an acceptable lenders policy was already issued in connection with the first mortgage. Because "[a] majority of the title insurance premium is composed of expenses related to the title search and abstract," *Analysis of the Title Insurance Industry*, 17-2 Journal of Ins. Reg. 213, Winter, 1999, at 14, these short title rundowns save the title insurer and its agent much time and money– and this explains, in large part, the reissue loan rate.

Second, there are just a handful of title insurers, and between them they will have *already* charged and collected premiums, sometimes several times over, to cover the very same "back" title. Though each time one of them issues a new lenders policy on a refinance it thereby *increases* their aggregate exposure, at the same time the lenders policy that was previously issued is necessarily canceled, thereby *decreasing* again their aggregate exposure. The net effect is more revenue, without more risk exposure.

---

[8] See, *New Hampshire Bar Association Title Examination Standards*, Article II, §§1-3, available at www.nhbar.org/pdfs/titlestandards.pdf (visited Sept. 25, 2006).

The plaintiffs and thousands of New Hampshire homeowners were charged premiums impermissibly calculated upon the full standard rate, though their refinance transactions qualified for the 40% substitution rate discount. They can be readily identified from First American's own agents' files, for purposes of returning the overcharges to them.

When the consumer first purchases the home with the help of a mortgage loan, he or she is typically charged for both on owner's policy of title insurance, and a lender's policy of title insurance. However, a refinance transaction involves the issuance of a new lender's policy only, because the owner's policy that was issued in connection with the initial purchase of the home remains in force. See, generally, "Questions About Title Insurance", available at www.alta.org (website for the American Land Title Association), visited May 2, 2007. The process by which title insurers issue a title insurance policy is essentially the same in every case. There are six basic steps that are usually followed in somewhat the same order in every real estate transaction: (1) opening the title order and referral to the title agent; (2) title search; (3) title examination; (4) issuance of the title insurance commitment; (5) settlement/closing the transaction; and (6) issuance of the Title Insurance Policy(s). *See generally*, "*The Closing Process Explained*", at the ATLA website, *supra*.

The typical refinance transaction, such as the transactions at issue in this case, begins when the owner of the property arranges for a refinance loan from a lender. Typically, the lender selects the title insurance agent and notifies the agent of the need for title

insurance and a settlement of the refinancing transaction. The agent, through an abstractor, searches the title, which typically reveals both: (1) the existing mortgage; and (2) the date that the property was purchased. Indeed, the title search will concretely show whether or not the property had been purchased by the borrower within the previous ten years. See, ALTA website, *supra*.

At the closing, the agent is clearly in charge. The agent handles the actual closing of the transaction. The agent pays off the earlier mortgage from the new loan proceeds and obtains appropriate releases. The owner signs the settlement sheet (known as the "HUD-1") and other documents presented by the agent. To complete the transaction, the agent releases the prior loan and records the release, records the appropriate documents to update the public record, and issues the title insurance loan policy paid for by the borrower. *Id.* Even though the closing may be the only contact the consumer has with the title agent or the insurer, First American does not have or require the use of a form to advise consumers of their various options for title insurance. Nor does First American disclose to the borrowers that they may qualify for the discounted reissue rate.

The sale of title insurance is problematic. One leading business publication just called the title insurance industry a "racket" that sells a product that is both "outdated" and "largely unneeded." See, "*Inside America's Richest Insurance Racket*", Forbes, Nov. 13, 2006. The pricing aspect of title insurance is especially problematic: recent press coverage has revealed that title insurers pay out just five to ten cents in claims for every dollar in premiums they collect. Melynda Dovel Wilcox, "*Home Buyers Beware*",

Kiplinger's Oct. 2001, at 96-100.  Indeed, here in New Hampshire, First American pays

out less than five cents for every premium dollar it collects from homeowners.

Demotech, Inc., *Performance of Title Insurance Companies*, at p. 157, *available at*

www.demotech.com (visited Sept. 25, 2006).

Though its effectiveness is debatable, the State of New Hampshire does attempt to

promote the public welfare by ensuring that title insurance rates are neither excessive nor

unfairly discriminatory.  RSA 416-A:15.  Our State's Title Insurance Code provides that

"[e]very title insurance company shall file with the commissioner its schedule of fees,

every manual of classifications, rules and plans pertaining thereto, and every

modification of any of the foregoing which it proposes to use in this state. In every such

filing, the company shall set forth that portion of the fee which is designated as premium

as herein defined."  RSA 416-A:6(II).  Moreover, New Hampshire insurance law

provides that "[n]o insurer shall make or issue a contract or policy except in accordance

with the filings that are in effect for the insurer as provided in this chapter."  RSA

412:16(XII).

Pursuant to New Hampshire's Title Insurance Code, First American filed its title

insurance rates with the Commissioner.  During the entire class period, its rate filing

provided that when a refinance to the same borrower on the same property is made within

ten years from the original loan, then if the original loan had title insurance the title

insurance premium is computed as 60% of the existing coverage.  The reissue rate is a

discounted rate that reflects the fact that when only a few years have passed – as many as

ten years – since the issuance of the previous title insurance policy, there is a reduced risk of title defects or other problems that may cause claims against the new title insurance policy, and also less work involved in examining the title for defects..[9]

Plaintiffs' position is that all of the information necessary to trigger entitlement to the discounted reissue rate was readily available to First American and its agents from standard forms and documents used in every transaction. At a minimum, the title order and preliminary title report provides all the information necessary to determine whether a prior policy exists. The loan application and title order alone will identify whether the property was purchased or refinanced within the previous ten years, information about any outstanding mortgages, and the name and address of the borrower.

Not surprisingly, many unknowing consumers in New Hampshire, including the plaintiffs, were entitled to the substitution rate discount from First American but did not receive it. Although First American's filed rate says absolutely nothing about the need for the consumer to produce evidence of a prior policy, it nonetheless contends that in order to be entitled to a discounted rate for title insurance, the prior policy that had been issued within the previous ten years must be produced by the consumer. Yet, in other reissue rate cases, the consumer has been excused from the requirement that he or she produce a copy of the prior policy. *See e.g.*, *Randleman v. First American Title Insurance Company*, 2006 WL 3411529 (N.D. Ohio Nov. 17, 2006) (where the insurer is

---

[9] A recent study issued by the Joint Center for Housing Studies of Harvard University found that consumers hold their mortgage loans, on average, for only 2 years before refinancing. Joint Center for Housing Studies of Harvard University, *The State of the Nation's Housing 2005*, at 6 and at Appendix A-4.

presumptively well-informed of all requirements to obtain applicable discounts and fails to inform the borrower, the insurer will be deemed to have waived any protections that the production of a prior policy might have been provided to the insurer). See also *Mitchell-Tracey*, 237 F.R.D. at 558 (quoting *In re Coordinated Title In. Cases*, 2 Misc.3d 1007(A), 784 N.Y.S. 2d 919 (2004)) ("In logical terms, it is not plausible to think that a consumer, made aware of the opportunity to save hundreds of dollars, would choose to pay the higher rate and forego a savings mandated by law").

Plaintiffs contended that in connection with all of the class members' refinance transactions, First American's Title Agent acted as the closing agent as well as First American's title agent, and it obtained loan payoff figures, conducted or reviewed the title search, attended the closings, cleared the title, and disbursed the loan proceeds. In connection with these closings it did not order nor review a "full" title search—in derogation of its own policies and procedures—and instead it relied upon a mere title "rundown" available to it at a fraction of the cost of a full title, together with "owners" and "survey" affidavits it had obtained from the plaintiffs and class members. Having done the rundowns and intending upon utilizing these affidavits, First American and its Title Insurance Agents knew or should have known the plaintiffs' and class members' transactions were all eligible for the substitution rate. Though the plaintiffs' and class members' simple refinance transactions qualified for the substitution rate—and though its agents treated them as simple refinances requiring mere "rundowns", neither First American nor its agents advised the plaintiffs and class members of the availability of the

37

substitution rate and instead it charged all of them the full standard rate, without their knowledge or consent. At the times plaintiffs and class members applied for the title insurance, they qualified for the reissue loan rate but were not advised of its availability, nor given it. Instead, they unknowingly paid First American the inapplicable, higher rate, out of their refinance loan proceeds, and were damaged thereby.

Moreover, plaintiffs' counsel–who again is constantly involved in consumer mortgage cases–reviewed hundreds of HUD Settlement Statements evidencing the title insurance charges at issue in connection with the four title insurance cases he worked on, and he and his associate also reviewed hundreds of mortgage and title records on line (at www.nhdeeds.com) to assess whether the transactions appeared to qualify for the reissue rate. Plaintiffs' counsel also questioned numerous title insurance agents in connection with the four cases, and obtained testimony from several of them. Finally, plaintiffs' counsel interviewed the plaintiffs and at least a dozen other class members as part of the factual and legal investigation incident to this case.

After a thorough investigation of the potential claims in this action, plaintiffs' counsel chose to pursue a statewide class action by New Hampshire homeowners seeking relief from the allegedly unlawful practices engaged in by First American, arising out of its alleged violations of its statutory and common law obligations in connection with the issuance of title insurance policies on residential mortgage refinances. The complaint alleged that First American cheated thousands of New Hampshire consumers who refinanced their mortgages, by charging them premiums for title insurance that were far in excess of the rates permitted under New Hampshire law. Plaintiffs' counsel concluded

38

that potential claims existed under the common law of New Hampshire, to recover the excess and unearned premiums paid to First American. Accordingly, counsel contended that First American, instead of charging and collecting a discounted refinance premium filed with and approved by the New Hampshire Commissioner of Insurance applicable to New Hampshire Applicants for title insurance who were simply refinancing their mortgages, First American, through its Title Insurance Agents and/or employees, instead collected the much higher regular premium from the plaintiffs and class members.

Plaintiffs sought a class of New Hampshire consumers whose refinanced were qualified to receive the reissue rate, but First American did not give them the reissue rate. They alleged that as a result of First American's highly profitable but unlawful conduct, they and the class members suffered actual damages in the amounts of the excessive and unlawful premiums collected from them, together with statutory interest running from the dates upon which they purchased the coverage. They explained that their damages were readily calculable using the *correct* rate schedule filed with the state.

Plaintiffs also respectfully suggest that their counsel's work done in identifying potential claims, his knowledge of the applicable law, and the extent of the resources his firm has committed to the case, is plainly evidenced by the extensive briefing he has submitted to this Court. Plaintiffs' briefs and supporting documents reflect a thorough understanding of the potential claims and the applicable law; as well as a unswerving commitment to devote substantial resources to the case.

Finally, plaintiff's counsel's experience in handling class actions and other complex litigation, and in handling the types of claims asserted in this action, is further evidenced

in counsel's work history, attached hereto as *Exhibit B*.

## THE PROPOSED SETTLEMENT

The parties reached agreement on the terms of the proposed settlement after conducting informal discovery, vigorous debate of legal and factual theories by counsel and extensive and often contentious arms-length negotiations. If the proposed settlement is approved by the Court, First American will amend its rate filing to provide for a mandatory discounted Refinance Rate for all qualified title insurance policies issued by First American. In addition, First American has agreed to provide, subject to Court approval, monetary consideration totaling a *minimum* of $330,200, to be used as follows:

  a. A Settlement Fund of $166,666, for distribution to qualified claimants as provided for in the Stipulation. The Stipulation also provides that First American will contribute additional monies in certain circumstances. Any funds remaining after full payment of all claims in the amount of 100% of the contested amount, will be returned to First American;

  b. $74,200 for mail and publication notice, and administration costs;

  c. $6,000 to the class representatives ($3,000 to each couple); and

  d. $83,334 to attorneys' fees.

It is understood and agreed by the parties that the total payment of $330,200, *except as otherwise provided in Section (5)(E)(4)(d) of the Stipulation*, constitutes First American's total financial obligation in connection with the settlement and First American shall have no further obligation to issue any kind of refund to the plaintiffs or

40

any Class Member in connection with the failure to compute or collect premiums for title insurance in accordance with the Refinance Rate and is released from any such claims pursuant to the settlement.

Additionally, as an important part of this Settlement First American agreed to file with the New Hampshire Department of Insurance, a substantially revised reissue rate provision. This new reissue rate provision 1) *requires* its agents to *always* give the reissue rate discount in transactions that otherwise qualify for it, 2) on the *entire amount* of the new mortgage, 3) with *no requirement that a copy of the prior policy be obtained*. The new provision will read:

> 7. Premiums for Reissue of First American Policies:
>
> A. Standard Loan Policy Reissues:
>
> If the borrower refinances within FIVE years of a recorded first mortgage by an institutional lender, the original loan is discharged, and a new mortgage is placed of record, the loan reissue rate **shall** be used and **applies to the amount of the new mortgage**. **No further evidence is needed to receive the loan reissue rate**.

[Emphasis added]. Although the relevant time period has been reduced from ten years to five years, this change is not compelling as the vast majority of residential first mortgage refinances occur within five years of the prior mortgage. Moreover, the shorter period is more in line with the applicable periods of its competitors in this State.

The proposed settlement, which was the product of serious, informed, non-collusive negotiations by counsel experienced in litigation, consumer law and class actions, is fair and adequate.

41

## NOTICE TO THE CLASS

The Stipulation provides that Class Counsel shall mail the Settlement Notice, Claim Form and Exclusion Form (copies of which are attached to the Stipulation as Exhibits C, A and B) to all Class Members identified in the Mailing List *via* first-class mail and will make diligent efforts to obtain any forwarding address and attempt redelivery as to all mail returned as undeliverable. As a part of the settlement, First American will provide Class Counsel with an electronic spreadsheet of all lenders policies of title insurance covering New Hampshire property issued by First American during the Class Period derived from First American's records, excluding those lenders policies where owners coverage was simultaneously purchased. The Mailing List will contain the information needed to provide mail notice to prospective Class Members, including (i) the name of the owner of the insured property; (ii) the street address of the insured property; (iii) the city, state and zip code of the insured property; (iv) the name of the lender (*i.e.*, the insured); and (v) the effective date of the lenders policy.

The Settlement Notice contains information sufficient to inform the Class Members of the nature of the lawsuit and of their legal rights and options. The Settlement Notice advises each Class Member that (a) the Court will exclude him or her from the class if the consumer properly requests to opt-out of the Class; (b) the judgment, whether favorable or not, will include all Class Members who do not request exclusion; and (c) any Class Member who does not request exclusion may, if he or she desires, enter an appearance through separate counsel.

The Settlement Notice has a Claim Form attached to it, as well, so that Class

Members who believe they qualified for the discount but did not receive it, can submit the Claim Form with the requested closing form (a sample of which appears on the back of the Claim Form) to qualify for benefits under the settlement. Importantly, each Claim Form contains refinance transaction information specific to that particular potential Class Member: More specifically, imported into each Claim Form is the potential Class Member's relevant Lender and Loan Date. Class Counsel insisted upon this customization in order to make it easy for the potential Class Members to identify the subject refinance so that they can pull the HUD Settlement Statement from their file.

Qualified claimants will receive as much as 100%, but in no case less than 50%, of the difference between (a) the amount of premium the qualified claimant actually paid and (b) the reissue rate premium, with no reduction for attorneys fees or costs.

In addition to mailing the Settlement Notice to class members, the Stipulation provides that Class Counsel shall have the Summary Notice (a copy of which is attached to the Stipulation as Exhibit G) published in the New Hampshire Sunday News for two consecutive weeks. Class Counsel will designate an Administrator to coordinate the notice and administration process, will outsource notice duties, and will either outsource, or retain, claims administration duties, in order to achieve efficiency and to minimize costs. *Stipulation*, Section B(5).

Class Members will have 60 days to opt out or to object to the Settlement Agreement after entry of the Proposed Order, provided that such date is at least 90 days after mailing of the Notice to ensure Class Members have ample opportunity to evaluate their rights

under the Settlement Agreement. The Notice contains opt out instructions for Class Members who wish to be excluded from the Class as well as an Exclusion Form for their use. The Settlement Agreement provides an opportunity for Class Members to object to the Settlement Agreement, by serving a statement of his or her objection upon Class Counsel, counsel for First American, and the Court. The Notice instructs any objectors to include the specific reasons for the objection, including any legal support the Class Member wishes to bring to the Court's attention and a description of any evidence the Class Member wishes to include in support of the objection. Any Class Member who does not opt out of the Settlement Agreement releases any claims that were raised or could have been raised in this matter.

Finally, Class Counsel will submit a request for approval of attorneys' fees in an amount not to exceed $83,333 (1/3 of the minimum monetary component of the settlement). Class counsel believes that the amount of the fee request will be less than the lodestar and he will file his declaration in support of the fee request in connection with final approval of the settlement. Class Counsel also will apply to the Court for an award of service fees for Mr. and Mrs. Scott, and for Mr. and Mrs. St. Louis, in the amount of $3,000 per couple.

## ARGUMENT

### I.  THE SETTLEMENT AGREEMENT SHOULD BE PRELIMINARILY APPROVED AS FAIR, REASONABLE AND ADEQUATE.

This Settlement Agreement presented to the Court for preliminary approval represents a fair and reasonable resolution of this dispute, and is worthy of notice to and

consideration by the Class Members. It will provide financial relief to class members and will relieve the parties of the burden of litigation. In order to begin the approval process, the parties have requested that the Court enter the Proposed Order certifying the Class, preliminarily approving the Settlement Agreement, providing for notice to the Class, and scheduling the final approval hearing. The Proposed Order also sets suggested deadlines for opt outs, objections, and the return of claim forms.

**A.   The Standard For Preliminary Approval Of Settlement Agreements.**

Federal Rule of Civil Procedure 23(e) requires court approval of a class action settlement. The *Manual For Complex Litig. (Fourth)* § 21.632 (2004), sets forth the procedures for preliminary approval of settlements: If the preliminary evaluation of the proposed settlement does not disclose grounds to doubt its fairness or other obvious deficiencies, such as unduly preferential treatment of class representatives or of segments of the class, or excessive compensation for attorneys, and appears to fall within the range of possible approval, the court should direct that notice under Rule 23(e) be given to the class members of a formal fairness hearing, at which arguments and evidence may be presented in support of and in opposition to the settlement.

At the preliminary approval stage, the question for this Court is whether the settlement falls well within the "range of possible approval," and is sufficiently fair, reasonable and adequate to warrant dissemination of notice apprising class members of the proposed settlement and to establish procedures for a final settlement hearing under Rule 23(e). *Id. See also, Durrett v. Housing Auth. of City of Providence,* 896 F.2d 600, 604 (1st Cir. 1990). In determining whether class action settlements should be approved,

"[c]ourts judge the fairness of a proposed compromise by weighing the plaintiff's likelihood of success on the merits against the amount and form of the relief offered in the settlement. [Citation omitted] . . . They do not decide the merits of the case or resolve unsettled legal questions." *Carson v. American Brands, Inc.*, 450 U.S. 79, 88 n.14 (1981). Courts generally favor settlements of class actions. "There is usually an initial presumption of fairness when a proposed class settlement, which was negotiated at arm's length by counsel for the class, is presented for Court approval." H. Newberg, A. Conte, *Newberg on Class Actions* (4th ed. 2002), §11.41.

## B. Reasons For Approval.

### 1. The Settlement Fund And Revised Rate Filing Provide Significant Benefits To The Class.

The settlement fund is designed to ensure that each and every consumer who, according to plaintiffs' legal theory, was entitled to the reissue rate discount, will receive a check for at least 50%, and possibly as much as 100% (depending on total claims submitted), of the discount in issue. To receive their portion of the settlement fund, the consumer needs to sign (no notary is required) and return the Claim Form sent to him or her with the class notice, along with the HUD Settlement Statement for the subject transaction so that the claims center can both confirm the amount charged and calculate the amount of relief provided under the settlement. A sample of a HUD Settlement Statement appears on the reverse side of the Claim Form, so the consumer can readily identify the form in his or her loan papers.

The monetary component of the settlement is a significant benefit to the Class Members because individual homeowners are unlikely to spend the time and money

necessary to recover, the amounts that First American allegedly overcharged in title

insurance premiums.  The alleged overcharges at issue in this case, which average about

$50-200 per consumer, are the type of damages that class actions are most suited to

remedy.  Newberg, §11.6.  Additionally, a significant number of class members are likely

to be unaware that their rights may have been violated.  The exact amount available to

each Class Member cannot be determined until the claims period has closed, because the

initial $166,666 settlement fund may be increased depending on the total number of

claims filed, however, as noted above, each qualified claimant will receive, at the very

least, 50% of the reissue rate discount in issue.

Second, as a significant part of the settlement the parties have agreed that First

American will file a revised reissue rate provision with the State Department of

Insurance, changing the relevant phrase in the filing from "the loan reissue rate may be

used" to "the loan reissue rate shall be used".  This will reasonably ensure that in the

future, all New Hampshire homeowners who are charged for First American title

insurance coverage on home mortgage refinances that qualify for the reissue

rate--including, no doubt, many of these very class members--will actually receive the

discount the next time.  Indeed, this change to First American's rate filing potentially

benefits all New Hampshire homeowners.

This significant economic benefit, coupled with the revised rate filing, demonstrates

that the proposed Settlement Agreement is fair, reasonable, and appropriate.  *See*,

*Declaration of Edward K. O'Brien*, ¶¶5-8, attached hereto as *Exhibit C*.

### 2. Voluntary Settlement Of This Class Action Serves The Interests Of The Parties, The Court, And New Hampshire Homeowners.

There is an overriding public interest in settling class action litigation. *Lazar v. Pierce,* 757 F. 2d 435, 439 (1st Cir. 1985). "By their very nature, because of the uncertainties of outcome, difficulties of proof, and length of litigation, class action suits lend themselves readily to compromise." Newberg, §11.41, *citing*, *HEW Corp. v. Tandy Corp.,* 1979 WL 1580 (D. Mass 1979) (settlement appropriate when it was uncertain that plaintiffs would prevail on the merits, the parties recognized that they would be faced with a lengthy and expensive trial, and the question of damages was indefinite). Similarly, settlement of this particular case is appropriate. Although the Scotts and the St. Louises believe they have valid common law claims, they understand that success on the merits is by no means assured and that this Settlement would resolve the conflicts underlying this class action without the necessity, time and expense of a protracted trial. The value of the benefits class members will receive under this Settlement is enhanced by the fact that the benefits will be provided now, without the delay, burden and risks of further litigation.

### 3. The Settlement Resulted From Arms-Length Negotiations And Is Not The Product Of Collusion.

The requirement that a settlement be fair is designed to protect against collusion among the parties. There usually is an initial presumption that a proposed settlement is fair and reasonable when it was the result of arm's-length negotiations. Newberg, §11.42. The extensive motion practice undertaken here, along with the excellent result for the class obtained in spite of the significant procedural and substantive hurdles

plaintiffs faced (including the serious legal hurdles identified above and by this Court in its Order on First American's dispositive motion), and the contentious, arms-length course of negotiations, these are all testaments to the non-collusive nature of the settlement.  The Settlement Agreement was the result of arm's-length negotiations by experienced class action lawyers. *See*, O'Brien Declaration, ¶6.

### 4. The Factual Record Was Well Developed Through Independent Investigation.

To make a preliminary determination on the fairness of a proposed settlement agreement, a court must have sufficient information to evaluate it.  *Manual for Complex Litig. (Fourth)* § 22.921 (2004). "There is no precise formula for what constitutes sufficient evidence to enable the court to analyze intelligently the contested questions of fact." Newberg, §11.45.

This statewide class action is one of many analogous statewide "reissue rate" class actions against First American and its various competitors.  All of these cases arise out of the title insurer's failure to provide the reissue rate discount to applicants who appear to qualify for it.  Class counsel's independent investigation has confirmed not only that the plaintiffs' failed to receive the reissue rate in their transactions, but also that this title insurer, and many other title insurers, routinely fail to provide the reissue rate discount in many transactions which—*according to plaintiffs' legal theory*--qualify for it.  See, O'Brien Declaration, ¶9.  Indeed, the underlying facts in this case are not genuinely disputed.  Instead, the dispute centers around substantive and procedural legal issues, most notably whether evidence of a prior policy was necessary to qualify for the reissue

rate, whether First American was obligated to provide the reissue rate in transactions that did in fact qualify for it, and, procedurally, whether a class action would be manageable given the potential need to examine tens of thousands of individual loan files in the possession of at least several dozen, if not hundreds, of title agents.

### 5.  The Proposed Notice To Class Members Is Adequate.

Under Federal Rule of Civil Procedure 23(c)(2), class members are entitled to notice of any proposed settlement and an opportunity to object or opt out before it is finally approved by the Court.  Manual for Complex Litig. (Fourth) § 21.31 (2004).  Notice is adequate if it is "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 174 (1974), *quoting, Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950*)*.

The Notice the parties propose here is clear and straightforward, providing putative class members with enough information to evaluate whether to participate in the settlement, as well as directions on how to seek further information.  Notice will be given by both mail and publication.  Addresses will be updated by means of the National Change of Address ("NCOA") database before Notice is mailed to Class Members.  The Notice, along with a Claim Form *individually tailored to identify each recipient's particular loan transaction*, and along with an Exclusion Form, will be mailed to the last known address of all Class Members by first class mail, and any Notices returned with a forwarding address will be promptly re-mailed to the forwarding address.  A Summary Notice will be published for two consecutive weeks in the New Hampshire *Sunday News*,

50

with a goal of achieving statewide publication notice. These proposed methods of providing notice are sufficiently adequate under Rule 23(c)(2).[10]

The potential complexity and length of this case, the hard-fought arm's-length negotiations, in-depth factual investigations and the adequacy of the proposed Notice all support preliminary approval of the settlement.

### 6.  The Case is Appropriate for Certification of a Settlement Class.

The Class, As set forth in Section (V)(B)(8) the Stipulation, the Class comprises:

> All "Class" or "Class Members" means all owners of New Hampshire property who, during the Class Period, refinanced mortgages on such property within ten years after the date of the issuance of a prior lenders policy of title insurance insuring a mortgage covering the same property, where there was no change in ownership, and who paid a premium for a lenders policy of title insurance issued by First American in an amount in excess of the Reissue Rate. "Class Period" means the period of time from June 30, 2003 through December 31, 2007.

This Class meets all of the requirements of Fed. R. Civ. P. 23(a) and 23(b)(3).

### i.   Rule 23(a).

The Class meets Rule 23(a)'s numerosity requirement because the estimated 30,000 potential class members "overwhelms any workable prospect of joinder." *See,* Order, p. 18. The plaintiffs' estimate is based on informal discovery responses indicating that during the class period, just over 50,000 applicants were charged for a lender's policy of title insurance in connection with a mortgage transaction in which there was no simultaneous issuance of an owner's policy. Plaintiffs reasonably believe, based upon their investigations in this and other title insurance cases, that at least 40% of the

---

[10] The Settlement provides that Class Counsel shall conduct confirmatory discovery pertaining to the compilation of the Class List. See, Settlement, Sec. B(8).

applicants' transactions did not qualify for the reissue rate discount (according to their legal theory) for any number of reasons, including that the transaction: 1) was not a refinance, or 2) no prior mortgage was refinanced, or 3) the earlier mortgage was too old, or 4) the earlier mortgage was not insured, or 5) the record borrowers have changed.[11]

The questions of law and fact in this litigation are substantially identical among the class members, namely, whether First American has breached its implied contracts with the plaintiffs and class members (or is unjustly enriched) by virtue of its premium pricing practices and policies. The Scotts and the St. Louises, and all members of the class they seek to represent, are refinancing homeowners who were entitled to receive the reissue rate discount, according to plaintiffs' legal theory, but did not receive it. For these reasons the commonality element is met.

The claims of the Scotts and the St. Louises are typical of those of the settlement Class and therefore meet Rule 23(a)'s typicality requirement. Like those of the Class, their common law claims arise from First American's practice of charging full premiums in transactions that appear to qualify for the reissue rate discount in its rate filing.

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the  interests of the class." Mr. and Mrs. Scott, and Mr. and Mrs. St. Louis, have no interests that are antagonistic to or in conflict with the class they seek to represent and their alleged injuries are identical to those suffered by class members. *See, Amchem*, at

---

[11] In any event, all class members who file timely and valid claims receive at least 50% of the contested amount, regardless of their number.

2251 (courts look simply at whether the representatives' interest are in any way antagonistic to or in conflict with those of the class members). In addition, undersigned counsel are active practitioners whose experience in consumer law and class action litigation is demonstrated by the O'Brien Declaration attached to this memorandum.

### ii.    Rule 23(b)(3).

The Classes meet the predominance requirement under Rule 23(b)(3) because virtually all of the issues of law and fact are identical among the class members in this case. *Waste Mgt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 296 (1st Cir. 2000) (predominance requirement satisfied by "sufficient constellation of common issues [that] bind class members together" and "cannot be reduced to a mechanical, single-issue test"). "The requirement of superiority is easily met in this case." A class action is the superior method of proceeding in this type of case because it allows the plaintiffs to pool claims which would be uneconomical to litigate individually. *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809 (1985).

# CONCLUSION

The proposed class action settlement is fair, reasonable, and adequate. For the foregoing reasons, the Scotts and the St. Louises respectfully request that this Court approve the Settlement Agreement on a preliminary basis so that Notice may be sent. Plaintiffs request that the Court confer with the parties to set a hearing for final approval of the settlement and to set appropriate deadlines for various settlement requirements.

Respectfully submitted,

James SCOTT, Sue SCOTT, Stephen
ST. LOUIS, and Ellen ST. LOUIS; for
themselves and on behalf of the putative
class members

By their attorneys,

*/s/ Edward K. O'Brien*
Edward K. O'Brien
NH Bar No. 2806
O'Brien Law Firm, PC
One Sundial Avenue, 5th Floor
Manchester, NH 03103
(603) 668-0600

Dated: September 23, 2008

### CERTIFICATE OF SERVICE

This is to certify that on September 23, 2008, I electronically filed the within and foregoing document with the Clerk of Court using the CM/ECF system which will automatically send e-mail notification of such filing to all attorneys of record.

/s/ Edward K. O'Brien
Edward K. O'Brien