# EXHIBIT C TO EXHIBIT 1

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| JAMES SCOTT; SUE SCOTT; STEPHEN ST. LOUIS; and ELLEN ST. LOUIS; for themselves and all others similarly situated;<br><br>Plaintiffs;<br><br>v.<br><br>FIRST AMERICAN TITLE INSURANCE COMPANY;<br><br>Defendant. | CASE NO.: **1:06-cv-286-JD**<br><br>DECLARATION OF<br>**EDWARD K. O'BRIEN**<br>IN SUPPORT OF SETTLEMENT AND APPOINTMENT OF CLASS COUNSEL |

I, Edward K. O'Brien, an attorney, hereby depose and state as follows:

1. The statements in this declaration are based upon my personal knowledge and, if called upon as a witness, I could and would testify thereto.

2. I am counsel for the plaintiffs in this case. I submit this declaration in support of the pending *Updated and Clarified Joint Motion for Preliminary Approval of the Class Action Settlement Agreement and Stipulation* ("Clarified Joint Motion"), including the request therein that the class be certified and that I be appointed class counsel.

3. I am an attorney in good standing before the Bars of The State of New Hampshire and the Commonwealth of Massachusetts, and I am admitted to practice in the federal district courts located within New Hampshire, Massachusetts and Connecticut, as well as before the First Circuit Court of Appeals.

4. I have exclusively handled consumer class actions for over 15 years, and I have successfully prosecuted numerous cases for consumers against mortgage lenders and credit and title insurers. *Exhibit B* to *Plaintiffs' Memorandum in Support of Updated and Clarified Joint Motion for Preliminary Approval of the Class Action Settlement*

*Agreement and Stipulation* ("*Plaintiffs' Memorandum*") is a true and correct copy of my work history.

5. I believe that the Settlement Agreement between the parties is fair and reasonable and in the best interest of the Settlement Class. The reasons for my belief are set forth in the Substitute Memorandum.

6. The Settlement was the result of arm's-length negotiations by experienced class action lawyers.

7. The Settlement provides substantial monetary benefits to the Class, benefits that may not be available in the event of continued litigation due to several very significant factual and legal hurdles likely to be encountered by the Plaintiffs in the continued prosecution of this case, as the same are identified and discussed in Substitute Memorandum.

8. In addition to monetary relief, the business practice changes provided for under the settlement, in the form of a substantially revised rate filing, will benefit numerous existing homeowners with the State of New Hampshire who are charged for title insurance issued by this Defendant in connection with their home mortgage refinances, because the new rate filing reasonably ensures that all homeowners who otherwise qualify for the reissue rate discount will actually receive it. *Exhibit A* to *Plaintiffs' Memorandum* is a true and correct copy of the new rate filing.

9. My investigation of the title insurance industry has revealed that Defendant, as well as many of its competitors, has routinely failed to provide the reissue rate discount in many transactions in which the consumer applicant appears to qualify for it according to a plain reading of the relevant reissue rate provision. I conducted my investigation in connection with this case and in connection with companion cases against this Defendant's competitors Chicago Title Insurance Company and First American Title Insurance Company.

10. Pursuant to Fed. R. Civ. P. 23(g)(1)(A)(i-iv)), the district court must consider the following factors in determining whether to appoint plaintiffs' counsel as class counsel: (i) Work done identifying potential claims; (ii) counsel's experience handling class actions (including those involving similar claims); (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel has and will commit to representing the class. Pursuant to Fed. R. Civ. P. 23(g)(1)(a)(i-iv), I believe I am suitable for appointment as class counsel, for the following reasons.

    a. I am very familiar with the mortgage industry and the role of title insurance within it. My practice focuses solely on the representation of consumers in individual and classwide challenges to unlawful and deceptive lending and business practices. Having formerly represented numerous banks and mortgage companies in state and federal regulatory compliance matters, and having served on the senior management team and board of directors of a financial services holding company (state-chartered bank, subprime mortgage company and leasing company), I believe I bring significant knowledge and experience to my investigation of the potential claims the plaintiffs and class members could bring against this title insurer.

    b. To begin with, I am well acquainted with, and keep up with, numerous similar "reissue rate" cases pending in other states. See, e.g., <u>Cohen v. Chicago Title Insurance Co.</u>, 2007 U.S. Dist. LEXIS 26137 (E.D. Pa., April 5, 2007); <u>Mitchell-Tracey v. United General Title Insurance Co.</u>, 237 F.R.D. 551 (D. Md. 2006) <u>Dubin v. Security Title Insurance Co.</u>, 832 N.E.2d 815, 162 Ohio App. 3d 97 (Ohio Ct. App. 2005); <u>In re Coordinated Title Insurance Cases</u>, 784 N.Y.S.2d 919, 2004 WL 690380 (N.Y. Sup. 2004); <u>Mitchell v. Chicago Title Insurance Co.</u>, 2003 WL 23786983 (Minn. Dist. Ct. Dec. 22, 2003); <u>Lentini v. Fidelity Natl Title Ins Co of New York</u>, U.S. District Court, District of Connecticut, No. 3:06-cv-00572-AWT; <u>Piazza v. First American Title Insurance Co.</u>, U.S. District Court, District of Connecticut, No. 3:06-cv-00765-AWT; <u>Castro v. Old Republic Natl Title Ins Co.</u>, U.S. District Court, District of Connecticut, No. 3:06-cv-00765-AWT. All of these cases arise out of the title insurer's alleged failure

3

to apply the discount rate on file with the state, to the class members' refinance transactions. Most of the cases contain or contained claims for breach of express and implied contracts, unjust enrichment, and money had and received. The title insurer moved to dismiss some or all of the claims, and the court ruled on the law as to each such claim. I keep abreast of these developments in the law, on a near daily basis, through LEXIS and PACER, including careful review of all briefs submitted by the parties. Likewise, I was attentive to the motions for class certification litigated in these cases, as well as the settlements eventually achieved in many of them. I also carefully examined New Hampshire's title insurance law (NH RSA 416-A), and all of our state's relevant common law.

        c.    The essence of the case is explained thusly: Institutional mortgage lenders require title insurance as a condition to making the loan, in order to assure the priority of their lien position.[1] Thus, title insurance is an inevitable and unavoidable cost of any residential refinancing transaction. Though New Hampshire homeowners cannot avoid paying for the lenders policy of title insurance when they refinance their first mortgage loans, it is not appropriate for First American to file its discounted reissue loan rate with the state and rely upon abbreviated title examinations consistent with transactions that qualify for its reissue loan rate, but then conceal the availability of the reissue loan rate and instead calculate its premium charges as if the much higher original rate applied. Yet this is precisely what First American has done in New Hampshire.

        d.    The title orders it received from the new lenders revealed that these were merely refinances of recent first mortgages given to institutional lenders, which universally require clean, standard form ALTA lenders policies. Accordingly, First American knew or should have known that these transactions qualified for its reissue loan

---

[1] One of First American's competitors has conceded that ("[l]enders in the United States generally require title insurance as a condition to making a loan on real estate, including securitized lending"). 2005 Form 10-K, First American Information Services Corp., at p. 1 available at http://www.First American.com/docs/SISCO_10-K_2005.pdf (visited May 5, 2007). This fact has not been seriously contested in any of these reissue rate cases.

4

rate, and First American necessarily relied upon the existence of an acceptable prior policy—and justifiably so—without bothering to obtain a copy of it, and it ordered shortened title examinations, called one- or two owner "rundowns." The problem is this: it then calculated the premiums based on its inapplicable standard full rate, rather than on the <u>applicable</u> filed rate– its reissue loan rate.[2]

      e.   Most New Hampshire homeowners know very little about title insurance. They are unaware that the industry—including First American—utilizes a two-tier premium pricing structure for the lenders policy required by institutional residential mortgage lenders. The higher, original rate is the maximum permissible premium the title insurance company may charge for the lenders policy when the home is being purchased and a <u>full</u> title examination is being conducted. The lower, reissue loan rate, is the maximum permissible premium the title insurance company may charge when the first mortgage is being refinanced and a <u>shortened</u> title examination (called a "rundown") is being conducted.

      f.   The reissue loan rate is used in these simple refinances for at least two reasons. First, the title insurer is <u>not</u> ordering, or reviewing, the usual 35-50+ year title examination required under New Hampshire's title standards.[3] Instead, it is merely ordering a short, less-expensive one- or two owner "rundown," which may cover a time period of just a few years. It orders this "rundown" because it reasonably believes that the "back" title was already examined and an acceptable lenders policy was already issued in connection with the first mortgage. Because "[a] majority of the title insurance premium is composed of expenses related to the title search and abstract," <u>Analysis of the Title Insurance Industry</u>, 17-2 Journal of Ins. Reg. 213, Winter, 1999, at 14, these short title rundowns save the title insurer and its agent much time and money– and this explains, in large part, the reissue loan rate.

---

[2] State title insurance law requires First American to retain for 20 years evidence of all title examinations it has relied upon in issuing title insurance coverage. RSA 416A:6.

[3] See, <u>New Hampshire Bar Association Title Examination Standards</u>, Article II, §§1-3, available at www.nhbar.org/pdfs/titlestandards.pdf (visited Sept. 25, 2006).

5

g.  Second, there are just a handful of title insurers, and between them they will have <u>already</u> charged and collected premiums, sometimes several times over, to cover the very same "back" title. Though each time one of them issues a new lenders policy on a refinance it thereby <u>increases</u> their aggregate exposure, at the same time the lenders policy that was previously issued is necessarily canceled, thereby <u>decreasing</u> again their aggregate exposure. The net effect is more revenue, without more risk exposure.

h.  The plaintiffs and thousands of New Hampshire homeowners were charged premiums impermissibly calculated upon the full standard rate, though their refinance transactions qualified for the 40% reissue rate discount. They can be readily identified from First American's own agents' files, for purposes of returning the overcharges to them.

i.  When the consumer first purchases the home with the help of a mortgage loan, he or she is typically charged for both on owner's policy of title insurance, and a lender's policy of title insurance. However, a refinance transaction involves the issuance of a new lender's policy only, because the owner's policy that was issued in connection with the initial purchase of the home remains in force. See, generally, "Questions About Title Insurance", available at www.alta.org (website for the American Land Title Association), visited May 2, 2007. The process by which title insurers issue a title insurance policy is essentially the same in every case. There are six basic steps that are usually followed in somewhat the same order in every real estate transaction: (1) opening the title order and referral to the title agent; (2) title search; (3) title examination; (4) issuance of the title insurance commitment; (5) settlement/closing the transaction; and (6) issuance of the Title Insurance Policy(s). <u>See generally</u>, "<u>The Closing Process Explained</u>", at the ATLA website, <u>supra</u>.

j.  The typical refinance transaction, such as the transactions at issue in this case, begins when the owner of the property arranges for a refinance loan from a lender. Typically, the lender selects the title insurance agent and notifies the agent of the need for

title insurance and a settlement of the refinancing transaction. The agent, through an abstractor, searches the title, which typically reveals both: (1) the existing mortgage; and (2) the date that the property was purchased. Indeed, the title search will concretely show whether or not the property had been purchased by the borrower within the previous ten years. See, ALTA website, supra.

      k.  At the closing, the agent is clearly in charge. The agent handles the actual closing of the transaction. The agent pays off the earlier mortgage from the new loan proceeds and obtains appropriate releases. The owner signs the settlement sheet (known as the "HUD-1") and other documents presented by the agent. To complete the transaction, the agent releases the prior loan and records the release, records the appropriate documents to update the public record, and issues the title insurance loan policy paid for by the borrower. Id. Even though the closing may be the only contact the consumer has with the title agent or the insurer, First American does not have or require the use of a form to advise consumers of their various options for title insurance. Nor does First American disclose to the borrowers that they may qualify for the discounted reissue rate.

      l.  The sale of title insurance is problematic. One leading business publication just called the title insurance industry a "racket" that sells a product that is both "outdated" and "largely unneeded." See, "Inside America's Richest Insurance Racket", Forbes, Nov. 13, 2006. The pricing aspect of title insurance is especially problematic: recent press coverage has revealed that title insurers pay out just five to ten cents in claims for every dollar in premiums they collect. Melynda Dovel Wilcox, "Home Buyers Beware", Kiplinger's Oct. 2001, at 96-100. Indeed, here in New Hampshire, First American pays out less than five cents for every premium dollar it collects from homeowners. Demotech, Inc., Performance of Title Insurance Companies, at p. 157, available at www.demotech.com (visited Sept. 25, 2006).

      m.  Though its effectiveness is debatable, the State of New Hampshire does attempt to promote the public welfare by ensuring that title insurance rates are neither

excessive nor unfairly discriminatory. RSA 416-A:15. Our State's Title Insurance Code provides that "[e]very title insurance company shall file with the commissioner its schedule of fees, every manual of classifications, rules and plans pertaining thereto, and every modification of any of the foregoing which it proposes to use in this state. In every such filing, the company shall set forth that portion of the fee which is designated as premium as herein defined." RSA 416-A:6(II). Moreover, New Hampshire insurance law provides that "[n]o insurer shall make or issue a contract or policy except in accordance with the filings that are in effect for the insurer as provided in this chapter." RSA 412:16(XII).

      n.    Pursuant to New Hampshire's Title Insurance Code, First American filed its title insurance rates with the Commissioner. During the entire class period, its rate filing provided that when a refinance to the same borrower on the same property is made within ten years from the original loan, then if the original loan had title insurance the title insurance premium is computed as 60% of the existing coverage. The reissue rate is a discounted rate that reflects the fact that when only a few years have passed – as many as ten years – since the issuance of the previous title insurance policy, there is a reduced risk of title defects or other problems that may cause claims against the new title insurance policy, and also less work involved in examining the title for defects..[4]

      o.    Plaintiffs' position is that all of the information necessary to trigger entitlement to the discounted reissue rate was readily available to First American and its agents from standard forms and documents used in every transaction. At a minimum, the title order and preliminary title report provides all the information necessary to determine whether a prior policy exists. The loan application and title order alone will identify whether the property was purchased or refinanced within the previous ten years, information about any outstanding mortgages, and the name and address of the borrower.

---

[4] A recent study issued by the Joint Center for Housing Studies of Harvard University found that consumers hold their mortgage loans, on average, for only 2 years before refinancing. Joint Center for Housing Studies of Harvard University, The State of the Nation's Housing 2005, at 6 and at Appendix A-4.

8

p.  Not surprisingly, many unknowing consumers in New Hampshire, including the plaintiffs, were entitled to the reissue rate discount from First American but did not receive it.  Although First American's filed rate says absolutely nothing about the need for the <u>consumer</u> to produce evidence of a prior policy, it nonetheless contends that in order to be entitled to a discounted rate for title insurance, the prior policy that had been issued within the previous ten years must be produced by the consumer.  Yet, in other reissue rate cases, the consumer has been excused from the requirement that he or she produce a copy of the prior policy.  <u>See</u> <u>e.g.</u>, <u>Randleman v. First American Title Insurance Company</u>, 2006 WL 3411529 (N.D. Ohio Nov. 17, 2006) (where the insurer is presumptively well-informed of all requirements to obtain applicable discounts and fails to inform the borrower, the insurer will be deemed to have waived any protections that the production of a prior policy might have been provided to the insurer). See also <u>Mitchell-Tracey</u>, 237 F.R.D. at 558 (quoting <u>In re Coordinated Title In. Cases</u>, 2 Misc.3d 1007(A), 784 N.Y.S. 2d 919 (2004)) ("In logical terms, it is not plausible to think that a consumer, made aware of the opportunity to save hundreds of dollars, would choose to pay the higher rate and forego a savings mandated by law").

q.  Plaintiffs contended that in connection with all of the class members' refinance transactions, First American's Title Agent acted as the closing agent as well as First American's title agent, and it obtained loan payoff figures, conducted or reviewed the title search, attended the closings, cleared the title, and disbursed the loan proceeds.  In connection with these closings it did not order nor review a "full" title search—in derogation of its own policies and procedures—and instead it relied upon a mere title "rundown" available to it at a fraction of the cost of a full title, together with "owners" and "survey" affidavits it had obtained from the plaintiffs and class members.  Having done the rundowns and intending upon utilizing these affidavits, First American and its Title Insurance Agents knew or should have known the plaintiffs' and class members' transactions were all eligible for the reissue rate.  Though the plaintiffs' and class members' simple refinance transactions qualified for the reissue rate—and though its

9

agents treated them as simple refinances requiring mere "rundowns", neither First American nor its agents advised the plaintiffs and class members of the availability of the reissue rate and instead it charged all of them the full standard rate, without their knowledge or consent. At the times plaintiffs and class members applied for the title insurance, they qualified for the reissue loan rate but were not advised of its availability, nor given it. Instead, they unknowingly paid First American the inapplicable, higher rate, out of their refinance loan proceeds, and were damaged thereby.

      r.   Moreover, I reviewed hundreds of HUD Settlement Statements evidencing the title insurance charges at issue in connection with the four title insurance cases I worked on, and my associate and I also reviewed hundreds of mortgage and title records on line (at www.nhdeeds.com) to assess whether the transactions appeared to qualify for the reissue rate. I also questioned numerous title insurance agents in connection with the four cases, and obtained testimony from several of them. Finally, I interviewed the plaintiffs and at least a dozen other class members as part of the factual and legal investigation incident to this case.

      s.   After a thorough investigation of the potential claims in this action, I chose to pursue a statewide class action by New Hampshire homeowners seeking relief from the allegedly unlawful practices engaged in by First American, arising out of its alleged violations of its statutory and common law obligations in connection with the issuance of title insurance policies on residential mortgage refinances. The complaint alleged that First American cheated thousands of New Hampshire consumers who refinanced their mortgages, by charging them premiums for title insurance that were far in excess of the rates permitted under New Hampshire law. I concluded that potential claims existed under the common law of New Hampshire, to recover the excess and unearned premiums paid to First American. Accordingly, the complaint contended that First American, instead of charging and collecting a discounted refinance premium filed with and approved by the New Hampshire Commissioner of Insurance applicable to New Hampshire Applicants for title insurance who were simply refinancing their

mortgages, First American, through its Title Insurance Agents and/or employees, instead collected the much higher regular premium from the plaintiffs and class members.

   t. Plaintiffs sought a class of New Hampshire consumers whose refinances were qualified to receive the reissue rate, but First American did not give them the reissue rate. They alleged that as a result of First American's highly profitable but unlawful conduct, they and the class members suffered actual damages in the amounts of the excessive and unlawful premiums collected from them, together with statutory interest running from the dates upon which they purchased the coverage. They explained that their damages were readily calculable using the <u>correct</u> rate schedule filed with the state.

   u. I also respectfully suggest that my work done in identifying potential claims, my knowledge of the applicable law, and the extent of the resources my firm has committed to the case, is plainly evidenced by the extensive briefing I have submitted to this Court. I respectfully suggest that my briefs and supporting documents reflect a thorough understanding of the potential claims and the applicable law; as well as a unswerving commitment to devote substantial resources to the case.

   v. Finally, my experience in handling class actions and other complex litigation, and in handling the types of claims asserted in this action, is further evidenced by my work history, a true and correct copy of which is attached to the Supporting Memorandum as Exhibit B.

 I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 23, 2008       <u>/s/ Edward K. O'Brien</u>
                        Edward K. O'Brien